## BOARD OF EDUCATION OF CITY OF ALBUQUERQUE v. AMERICAN NAT. BANK OF OKLAHOMA CITY, OKL.

(Circuit Court of Appeals, Eighth Circuit. November 19, 1923.)

No. 6287.

1. **Evidence ⬤⟳400(3)—Terms of contract effected by exercise of written option cannot be varied by parol.**

Where plaintiff was given an option to purchase bonds to be issued by a board of education on terms embodied in a written contract, the contract effected by an exercise of the option cannot be varied by conversations between plaintiff's agent and individual members of the board, either before or after exercise of the option was declared.

2. **Contracts ⬤⟳245(1)—Supplemental agreement to settle dispute as to meaning of contract not substituted contract.**

Where there was a dispute between the parties to a written contract for the sale and purchase of bonds as to the time of delivery and payment thereunder, a further agreement covering such matter is not a new contract, which takes the place of the old, but is merely supplemental to settle the dispute.

3. **Contracts ⬤⟳68—Settlement of dispute is sufficient consideration for contract.**

An agreement between parties to settle a dispute as to the meaning of a contract is based on a sufficient consideration.

4. **Schools and school districts ⬤⟳97(5)—Attempted modification of written contract of sale of bonds held ineffective.**

Where a written contract provided for the sale and delivery of bonds by a board of education for cash, a subsequent agreement that they should be delivered in advance of payment *held* void and ineffective to change the original contract.

5. **Contracts ⬤⟳247—Modification must be shown to be definite and certain.**

One claiming that a contract was intended to modify a prior contract, must show that the later contract was definite and certain in its terms.

Kennedy, District Judge, dissenting.

In Error to the District Court of the United States for the District of New Mexico; Colin Neblett, Judge.

Action at law by the American National Bank of Oklahoma City, Okl., against Board of Education of the City of Albuquerque. Judgment for plaintiff, and defendant brings error. Reversed and remanded.

A. B. McMillen, of Albuquerque, N. M., for plaintiff in error.

George S. Downer, of Albuquerque, N. M. (W. A. Keleher, of Albuquerque, N. M., on the brief), for defendant in error.

Before STONE, Circuit Judge, and VAN VALKENBURGH and KENNEDY, District Judges.

VAN VALKENBURGH, District Judge. On and prior to the 3d day of December, 1919, the board of education of Albuquerque, N. M., had in contemplation the issuing of the bonds of its said school district in the sum of $425,000, for the purpose of constructing certain school buildings in said city. On or about December 3, 1919, the American National Bank of Oklahoma City, through its bond department, proposed to said board that it would prepare and furnish all forms and proceedings necessary to the authorization and issuance of

⬤⟳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

these bonds, furnishing the required services and supplies, and guaranteeing the approving opinion of recognized bond market attorneys, among whom were named Messrs. Caldwell & Raymond of New York City. Remuneration for such services was to be one-half of 1 per cent. of the face of the bonds upon the completion of the contract. This proposal was accepted by the board, and the bank performed its obligations under this so-called proceedings contract. The preliminary steps were found satisfactory by Caldwell & Raymond, who offered to give a formal preliminary approving opinion, not covering, however, the sale and proof of delivery and payment, which stage of the proceedings had not yet been reached, or, at least, had not been certified to these attorneys. In due course the board of education gave notice for the sale of its bonds and prescribed the conditions. Among other things, it was provided in this notice that each bid was to be accompanied by a cashier's or certified check or bank draft in the sum of $8,500, payable without conditions to the board of education, or to its treasurer, to be applied as part payment on said bonds if and when delivered, and to be forfeited as liquidated damages in the event said bonds were awarded to the bidder and said bidder should fail, neglect, or refuse to take up and pay for said bonds within five days after their delivery for payment; said check or draft to be returned promptly to the bidder whose bid was not accepted by the board, or in case said board should be unable to furnish the approving opinion of Caldwell & Raymond, and make delivery of said bonds within a reasonable time. It was further specified in the notice that said bonds were offered and were to be sold subject to the approving opinion of Caldwell & Raymond, of New York, which opinion said board agreed to furnish to the purchaser. Among others, the defendant in error made a bid for this bond issue. This bid was dated March 10, 1920, and embraced two propositions. The first proposition was at the rate of 96¾ cents on the dollar, and is not material to this controversy. The second or alternative proposition was as follows:

"'If the above proposal is not acceptable, we hereby agree in this proposal No. 2 to remit one-half of our proceedings contract for an option on the above described bonds to expire April 15, 1920, at which time, if we exercise the option, we will remit all of our proceedings contract accepting the bonds on the above deliveries, said option price to be 98½ cents on the dollar."

The deliveries referred to were set out in proposition No. 1 in the following language:

"$50,000 to be taken up by us on demand. $125,000 June 15, 1920. $100,000 August 15, 1920. $50,000 October 15, 1920. $70,000 December 15, 1920. $30,000 January 15, 1921. You are to have the option of having the bonds taken up at any time prior to the above specified deliveries, and if the money is not needed by the above specified dates, we hereby agree to deliveries after such dates and to pay accrued interest to such time as the board needs the money."

Included in this written bid was the following:

"Attached hereto cashier's check for $8,500 as evidence of our good faith, and to be forfeited to you as liquidated damages in the event we fail to fulfill our part of this contract. If our bid is not accepted, the attached check is to be returned to our representative."

The second or option clause of this bid was accepted by the board, and March 11, 1920, the parties entered into a written contract to that effect, wherein the bank remitted one-half of its proceedings contract in the sum of $1,062.50, and was given an option to be exercised on or before April 15, 1920, for the purchase of the full issue of said bonds at the rate of 98½ cents on the dollar, together with accrued interest to the date of each installment of bonds; said bonds to be delivered and paid for in installments as required by the board of education, of which requirements the bank should be notified at least 30 days prior to the date fixed for the delivery of bonds and payment. It was further provided that, pending the exercise of said option, the board should hold the check for $8,500 indorsed to it, and in case the bank should not elect to exercise the said option said check was to be returned to it. In case the bank should elect to exercise the option provided for in this contract, the said check of $8,500 was to be cashed by the board and held to apply on the last installment of bonds to be delivered to and paid for by the said bank. On April 15, 1920, as shown by the minutes of the board of education, the following proceedings were had:

"Mr. Jenkins, representing the American National Bank of Oklahoma City, Oklahoma, addressed the board, and acting as the agent of his bank, exercised the option which was given the American National Bank of Oklahoma City, Oklahoma, at the meeting of the board of education on March 11, 1920, in accordance with the terms of the contract entered into between the American National Bank of Oklahoma City, Oklahoma, and the board of education of the city of Albuquerque, New Mexico, on that date (March 11th, 1920); said option providing that, if exercised, the American National Bank of Oklahoma City, Oklahoma, would purchase the $425,000 bond issue of the board dated February 1, 1920, for ninety-eight and one-half (98½) cents on the dollar and accrued interest to date of delivery of bonds, and remit the fee due them for handling the legal proceedings connected with the bond issue."

The following day appears the first disagreement between the parties. On that day Mr. Jenkins, representing the bank, went to the clerk of the board of education and demanded delivery of the bonds; this was refused. He then went to Mr. McRea, a member of the board, and told Mr. McRea that he exercised the option, with the understanding that the bonds were all to be delivered to the bank to be disposed of as purchasers could be found, and paid for when payment should be demanded by the board; all accrued interest, and interest to the time of payment, to be paid by the bank. Mr. McRea said that he had understood that the bonds were to be delivered in installments; thereupon Jenkins announced that he would have to refuse to take the bonds. The result was that there were further interviews and discussions between representatives of the bank and members of the board, and finally, on or about April 19th, four days after the formal exercise of the option, the board and Jenkins, on behalf of the bank, executed a paper entitled "Agreement of Delivery $425,000 School Bonds." This paper is in the following language:

"It is hereby agreed by the board of education of Albuquerque, New Mexico, to deliver to the American National Bank of Oklahoma City $425,000 school bonds, to be held in escrow until such time as the board of education of Albuquerque shall require the bond department of the American National

Bank to take up and pay for said bonds at the rate of 98½ cents on the dollar and accrued interest: Provided, however, that the bond department of the American National Bank shall have the privilege of paying for any or all of said bonds at any time. The bond department of the American National Bank herein agrees to pay accrued interest on such amounts as it elects to pay for in advance to the date when the money is required by notice from the board of education of the city of Albuquerque. The bond department of the American National Bank further agrees that securities costing as much as the par value of the Albuquerque school bonds will be put up for all bonds it elects to take in advance, not in lieu of Albuquerque bonds, but as additional protection in connection with all other outstanding contracts between the board of education of the city of Albuquerque and the bond department of the American National Bank."

It is over the interpretation of this document, and its effect upon the contract of purchase of the bonds in question, that this controversy has arisen. The bank contends that under its terms it was entitled to a delivery of the bonds in advance of payment, and that it exercised its option only upon that condition. The board insists that the option was exercised unconditionally, but that by the delivery agreement it consented that for greater convenience the bonds might be delivered in escrow, control, however, not to be surrendered until payment made upon the exercise by the bank of its election to take up and pay for said bonds in installments or otherwise. The final result was that on June 26, 1920, the bank declared the contract for the purchase of the bonds to be terminated and demanded the return of its check for $8,500. This being refused by the board, the bank brought suit to recover its deposit of $8,500 and for the full amount of $2,125 under its proceedings contract. The board, on its part, by its answer, both resisted the recovery prayed and interposed a counterclaim for damages because of the bank's alleged breach of the contract of purchase. A jury was waived in writing, and the court rendered judgment for the plaintiff bank for the full amount of the $8,500 deposit, and for one-half the proceedings contract in the sum of $1,062.50. The board brings error to this court. The following are the points relied upon by plaintiff in error in its brief:

(1) That the plaintiff (defendant in error) by the express terms of its several contracts lost the right to compensation under the proceedings contract the moment it became the purchaser of defendant's (plaintiff in error) bonds.

(2) That the $8,500 deposit became the property of the defendant (plaintiff in error) the moment the plaintiff (defendant in error) became the purchaser of the bonds; plaintiff's only right being to have that sum applied to the purchase of the last installment of bonds.

(3) That the so-called delivery agreement was no contract, was void from its inception, and therefore in no way modified the terms of purchase.

(4) That the admission of testimony as to conversations between plaintiff's agent and individual members of the school board is prejudicial error, and in any event could in no way modify or change the plain terms of the written contracts made between the plaintiff and defendant at regular sessions of the school board.

The defendant in error on its part contends that the bank was legally entitled to refuse to carry out the contract to purchase the bonds:

294 F.—2

(1) Because the board did not furnish to the purchaser the approving opinion of the bond attorneys.

(2) Because the delivery agreement was illegal, and that without it the minds of the parties did not meet, and that the option to purchase was therefore not exercised.

[1] The option proposal made by the bank on March 10th, followed by the acceptance of the board, as embodied in the written contract of March 11th, and the exercise of the option by the bank in board meeting on April 15th, as evidenced by the minutes of the board, constituted a complete and valid contract for the purchase of the bonds by the bank at 98½ cents on the dollar upon the terms of delivery set out in the option proposal made by the bank on March 10th. That the option was duly exercised, as stated in the minutes, is conceded by Jenkins, the bank's agent. His testimony upon this point is as follows:

"Q. You then went to the board meeting on the evening of the 15th? A. Yes, sir.

"Q. What happened at that meeting? Did you say? A. In substance, I exercised the option, that is about all I said.

"Q. Was anything said by the board, or any member of the board, in response to your statement that you exercised the option? A. I don't recall that there was anything said."

The contention of the bank that this option was exercised conditionally is based primarily upon conversations claimed to have taken place between Jenkins and some members of the board before the meeting on the evening of April 15th. Jenkins had a telegram from the manager of the bond department of his bank in the following language:

"Willing take ninety eight and half including fee delivery here Installment payments conditions very bad."

He claims to have exhibited this telegram to Mr. McRea, and perhaps one or two other members of the board, and that it was understood that he had no authority which would permit him to exercise the option otherwise than upon the condition that the bonds should be delivered to the bank in advance of payment. It is not contended that this announcement was made to the board in its organized capacity, nor that the exercise of the option was accompanied by such a reservation. On the other hand, this contention of Jenkins is categorically denied by all members of the board with whom such conversations are said to have taken place. All deny previous knowledge of the telegram to which reference has been made. That informal conferences were held between represntatives of the bank and members of the board following the exercise of the option is conceded; but no formal action was taken until the execution of the "agreement of delivery," about four days later. Upon well-established principles these conversations, both before and after the exercise of the option, even if admitted, could have no effect of varying the contract made. They were admissible, if at all, only to explain the situation and the reason for making the agreement of delivery.

We are therefore called upon to determine the effect of that writing. It is said to evidence what the real understanding of the parties was

at the time the option was exercised, but this record does not permit us to give it that significance. A contract, definite and unambiguous in its terms, had been made; that contract cannot be invalidated by evidence aliunde of what the parties had in mind, inconsistent with the plain meaning and significance of what they said and did. Furthermore, the testimony negatives the contention that there was any mutual understanding different from that embodied in the contract made.

[2] But it is insisted that the delivery agreement was in itself a new contract between the parties, or, at least, such a modification of the former contract as to establish a new understanding and agreement between them. Upon its face it does not purport to be a substitute for the original contract. It is called "an agreement of delivery." It has to do only with a phase of the contract of purchase, and embodies only so much of the terms of the original contract as were essential to an understanding of its purpose. Prior to its execution this situation was presented: A contract of purchase, full, complete, and definite in its terms; a contention on the part of the bank as to its interpretation; a refusal on the part of the board to accept that interpretation; thereupon a definite refusal on the part of the bank to perform, unless the board would consent to the terms of delivery demanded by it. Such action by the bank amounted to a breach of the contract. As an adjustment of this dispute the agreement for delivery was made; thereby the breach was waived and the original contract was modified as to the terms of delivery, in so far as the new agreement might be effective for that purpose. The result was not a new contract as commonly understood, but a concession as to the delivery of the bonds made by the board to avoid a repudiation of the contract.

[3] Now, both parties claim that this agreement of delivery is void—the board holding that, for that reason, the original contract remains in force; the bank insisting that, inasmuch as the original contract was replaced by this agreement, if the latter is void, then no contract between the parties remains. The board contends that the agreement is void for want of consideration. This contention we do not think can be sustained.

"If disputes have arisen under a contract, and the parties thereto enter into a new contract as a means of adjusting such disputes, such adjustment of disputes is a sufficient consideration." Page on Contracts (2d Ed.) vol. 4, par. 2463.

[4] If such new contract be in writing it may import a consideration. Id. 2461. However, the bank likewise declares the delivery agreement to be invalid, but for the reason that it provides for delivery of the bonds in advance of payment and does not contemplate a sale for cash. In this view we concur. N. M. Statutes Annotated, Code of 1915, § 4902; Board of Education v. Citizens National Bank, 23 N. M. 205, 167 Pac. 715; Town of Greenburg v. International Trust Co., 94 Fed. 755, 36 C. C. A. 471; Scipio v. Wright, 101 U. S. 665, 25 L. Ed. 1037; D'Esterre v. City of New York, 104 Fed. 605, 44 C. C. A. 75.

[5] Incidentally, if its terms are ambiguous, the effectiveness of the delivery agreement may well be doubted for another reason:

"While the parties to a contract may modify it by a subsequent contract which is shown by their acts, the acts which are relied upon to modify a prior contract must be unequivocal in their character. Acts which are ambiguous in their character, and which are consistent either with the continued existence of the original contract, or with a modification thereof, are not sufficient to establish a modification." Page on Contracts, § 2458.

"The party who asserts an alteration in an original written contract by the course of business between the parties thereto must bear the burden of showing that the minds of the parties met upon a modification definite in terms." Northwestern Insurance Co. v. Connecticut Fire Insurance Co., 105 Minn. 483, 117 N. W. 825.

The Supreme Court of the United States has stated the proposition in this form:

"There can be no contract without the mutual assent of the parties. This is vital to its existence. There can be none where it is wanting. It is as indispensable to the modification of a contract already made as it was to making it originally. Where there is a misunderstanding as to anything material, the requisite mutuality of assent as to such thing is wanting; consequently the supposed contract does not exist, and neither party is bound. In the view of the law in such case, there has been only a negotiation, resulting in a failure to agree. What has occurred is as if it were not, and the rights of the parties are to be determined accordingly." Utley v. Donaldson, 94 U. S. loc. cit. 47 (24 L. Ed. 54).

In the instant case, as we have seen, the original contract was not superseded, but the parties undertook to modify the terms of delivery. There is a sharp conflict between them as to the meaning of the modified terms. The board contends that the delivery was to be to the bank, as distinguished from its bonding department, in escrow; in other words, that the bank was to occupy the position of a trustee, the board retaining control over the bonds, placed in the bank merely for convenience, until the bond department should elect to take up the bonds, or any part thereof, and pay for them. The bank insists that this was to be an absolute delivery of the bonds for purposes of sale, payment to be made when the board should make demand therefor, interest to be paid accordingly. Whether the term "escrow" could be properly applied to such a situation, which would necessitate a subdivision of the bank and its bonding department into separate and distinct entities, need not be decided. The term "escrow" was used, and for a purpose. It imports a substantial meaning to the common understanding. The language used, and the irreconcilable differences disclosed in the interpretation of that language, defining the terms of delivery, support the view that on making this agreement of delivery there was no mutual understanding between the parties, and therefore that no definite and unequivocal modification of the original contract resulted.

However this may be, the written agreement is presented for judicial interpretation. The defendant in error contends that it contemplates an absolute delivery of the bonds in advance of payment and without cash consideration. We accept this interpretation, and declare the agreement invalid and ineffective for that reason. In such case, what was the effect of this later agreement upon the earlier contract? As we have seen, it was not intended to abrogate that contract, but, at most, to modify the terms of delivery. It was void for all

purposes. The rule is that, if a later contract is invalid and unenforceable, it cannot abrogate or modify an earlier contract. That earlier contract was complete and binding upon its face. No competent evidence was introduced to impair it, and the evidence tendered, even if admissible, falls short of establishing the contention of defendant in error. This being so, the original contract stands, and defendant in error has breached it by its refusal to perform.

This brings us to the second contention of defendant in error that the bank was not bound to accept the bonds because the board failed to furnish the approving opinion of Caldwell & Raymond. We are of opinion that under the terms of the notice of sale, upon which the bids of purchasers were based, the obligation to furnish such an approving opinion rested with the board. The obligation of the bank in this respect related entirely to the proceedings contract; that is to say, as to the regularity of the bonds in form and the formalities attending their authorization and issue. But did not the board substantially discharge its duty in this regard? At the request of the board the bond department of the bank called upon Caldwell & Raymond, by letter of May 15, 1920, for their opinion upon this bond transaction. In that letter the request was put in the following form:

"Please advise us whether you will issue your final approving opinion of all the bonds, providing they are all delivered, the payment for them to be made in installments after their delivery, and also providing that these installment payments be guaranteed by a deposit with the trustee of these bonds or other bonds agreed upon for this purpose."

To this, on May 18th, Caldwell & Raymond made reply:

"We do not exactly understand the final paragraph of your letter. If in referring to 'a deposit with the trustee of these bonds' you refer to the bonds of the issue not paid for, the arrangement seems to be equivalent to a delivery and payment in installments, and we can see no objection to it. In referring to 'the trustee,' you doubtless mean some financial institution acceptable to both yourselves and to the board of education. Apparently the only advantage of such an arrangement would be having the bonds ready for delivery at some convenient place. We could arrange in that event to have our opinion ready for delivery with the bonds when they are paid for. We do not see, however, how we could approve a delivery of the bonds in advance of payments for them, even if the payments of the purchase price should be guaranteed by the deposit of other bonds."

From this it will be seen that Caldwell & Raymond declared their willingness to render an approving opinion under the terms of the original contract and under the terms of the delivery agreement as interpreted by the board of education, but declined to approve the delivery of the bonds in advance of payment, as demanded by the defendant in error, and under the construction placed by it upon the agreement for delivery. Such was the view taken by the bank, which, on June 26th, through the manager of its bond department, wrote the board as follows:

"Caldwell & Raymond, attorneys of New York, on whose approving opinion you offered for sale and we contracted to purchase your $425,000 5½ per cent. building bonds, have refused to give their approval on said bonds on delivery as agreed upon between us, and for this reason our contract for the purchase of said bonds is terminated."

In other words, the bank was demanding an approving opinion upon a construction of the agreement for delivery which, under the law and under its own claim, as now addressed to the court, rendered that agreement invalid and of no effect. Under such circumstances the board was not required to make further effort to procure the approving opinion of the attorneys upon a contract thus in effect expressly repudiated by the bank. The bank remitted one-half of the amount due under its proceedings contract as a consideration for the granting of the option to it. It agreed to remit the balance upon the exercise of that option. The option was exercised, and the bank has refused to perform the contract resulting therefrom. As a consequence it can recover nothing for its services under the proceedings contract.

The deposit of $8,500 did not become the property of the board under the provisions of the notice of sale, because the conditions under which that deposit was held were altered by the option agreement of March 11th, providing that the check was to be cashed by the board and held to apply on the last installment of bonds to be delivered to and paid for by the bank. No right of forfeiture appears. The contract of purchase was not performed, and there is no installment of bonds upon which this sum of $8,500 can be applied. Nevertheless the board is entitled to hold this money, or so much thereof as may be sufficient to recoup it for any loss it may have sustained by reason of the bank's breach of its contract. If no loss is established, the bank is, of course, entitled to recover.

It follows from what has been said that the judgment below must be reversed, and the cause remanded for further proceedings in accordance with the views herein expressed.

KENNEDY, District Judge (dissenting). I regret that I am unable to concur in the opinion representing the majority views of the court, and my reasons may be briefly stated as follows:

The gist of the matter for determination by this court rests in the construction of the contract for the purchase of the bonds between the parties. The principle so frequently laid down by the courts, and again reiterated in the prevailing opinion here, that there can be no contract without the mutual assent of the parties, is the true basis for a consideration of the questions involved. The trial court, having the witnesses and all the circumstances of the case immediately before it, found, virtually, that there was but one contract, consisting of two different parts; one touching the exercise of the option to purchase, and the other the delivery of the bonds, which, carried to its ultimate and logical conclusion, means that there was no meeting of the minds of the parties until both were executed and in effect. The latter clause or portion of the contract containing provisions void in law necessarily made the entire contract invalid. The evidence in the case seems to me to be sufficient to sustain this finding and conclusion of the trial court, which should not be disturbed, and which would result in an affirmance of the judgment.